[No. H036629. Sixth Dist. Sept. 19, 2012.]

COUNCIL OF SAN BENITO COUNTY GOVERNMENTS, Plaintiff and Appellant, v.
HOLLISTER INN, INC., Defendant and Respondent.

**COUNSEL**

Matthew W. Granger, County Counsel, Shirley L. Murphy, Deputy County Counsel; Meyers, Nave, Riback, Silver & Wilson and Brenda Aguilar-Guerrero for Plaintiff and Appellant.

Briscoe Ivester & Bazel, John Briscoe and Richard Wallace for Defendant and Respondent.

## Opinion

**ELIA, J.**—This case involves two consolidated actions in eminent domain brought by the Council of San Benito County Governments (COG), a joint powers authority created under a joint powers agreement between the County of San Benito, the City of Hollister, and the City of San Juan Bautista, to acquire property for the Highway 25 bypass project. In the eminent domain proceedings, COG sought to condemn real property or interests in real property belonging to "Janet P. Roberts, Trustee of The Janet P. Roberts Family Trust, created under Agreement dated November 24, 1982, as amended and restated" (Roberts) and respondent Hollister Inn, Inc. (Hollister Inn). The project resulted in the elimination of a roadway easement over Roberts's private property connecting Hollister Inn's property to Highway 25.

On appeal from the final judgment in condemnation, COG challenges (1) the trial court's order of conditional dismissal that dismissed the action unless COG cured what the court found to be a gross abuse of discretion in adopting resolutions of necessity and (2) the trial court's associated order awarding reasonable litigation expenses in the amount of $233,750 to respondent Hollister Inn. Both orders were incorporated into the final judgment, which recognized that COG had taken corrective action before judgment to comply with the order of conditional dismissal. COG contends the trial court's orders were erroneous because, among other reasons, the court misconstrued Code of Civil Procedure section 1240.350.[1] We agree.

We conclude that the trial court erred in finding that COG had committed a gross abuse of discretion, issuing the order of conditional dismissal, and awarding reasonable litigation expenses to Hollister Inn.

I

*Procedural Background*

COG gave written notice to respondent Hollister Inn that, at its meeting of February 16, 2006, it would be considering the adoption of a resolution of necessity to condemn real property, a portion of assessor's parcel No. (APN) 053-380-008, for the "Highway 25 Hollister Bypass Project." The staff report for the meeting indicated that the bypass project involved the acquisition of real property interests from 30 property owners, COG had negotiated voluntary agreements with 13 property owners at that point in time, and the staff was recommending that COG adopt the resolutions of necessity authorizing

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise specified.

the filing of eminent domain actions. In the report, staff explained: "Access from Hollister Inn['s property] onto the existing Highway 25 will be closed, and a sign for the Inn and a dumpster will be relocated. The access must be closed due to the curved configuration of the connection of the Bypass to Highway 25."

At the hearing Ann Arnold, who represented Hollister Inn, stated that there had not been a showing that the acquisition would result in the least private injury to her client. She pointed out that the project would eliminate the connection between Hollister Inn's property, on which it operated a Best Western hotel, and Highway 25. She indicated that the right-of-way that COG was seeking to acquire was "the main entrance and exit to the hotel" and acquisition would "severely damage business and impact . . . profits." She expressed frustration that she had just recently learned that the plans showing an alternative easement were not current.

A female, who is unnamed in the transcript of the proceedings but who the parties identify in their appellate briefs as the project manager for the bypass project, stated that the driveway was not in a safe location. The female speaker acknowledged that access would be eliminated and the possibility of relocating the driveway had been previously investigated and rejected because Hollister Inn was not the owner of the property that would have been condemned and the project could not condemn someone else's property (in this case Roberts's property) for the benefit of an adjacent property owner. Shortly thereafter, Carla, presumably Carla Vincent,[2] who the briefs indicate was the same female speaker, mentioned the possibility of Hollister Inn negotiating an alternative easement somewhere farther north along the bypass, which would be a safer location.

Ann Arnold spoke again. She indicated that 80 to 90 percent of the hotel's business came in from Highway 25 and condemnation would cause "severe repercussions to the profits and bottom line of our client . . . ." She explained that, in addition to eliminating ingress and egress to the hotel on Highway 25, the project was adding a center median on San Felipe Road, which was going to prevent truckers and drivers traveling north on that road from making a direct left into the hotel and 18-wheelers were not going to be able to make a U-turn on that road. She asserted that the severance damages had not been properly addressed.

The chairwoman of COG's board indicated that presumably an easement could be negotiated but COG could not take Roberts's property to create a

---

[2] Carla Vincent was introduced at the hearing as an employee of Parsons Transportation Group and the design engineer for the Highway 25 Hollister bypass project.

substitute access easement for Hollister Inn's property because that would be taking private property rights for the benefit of another private entity.

On February 16, 2006, the board of directors of COG adopted, among others, resolution of necessity 6-18 (APN 053-380-009) to acquire a fee simple interest in certain property belonging to Roberts. In that resolution, COG's board found and determined the requisite facts, including that "[t]he proposed Project is planned and located in the manner that will be most compatible with the greatest public good and the least private injury." Resolution of necessity 6-13 (APN 053-380-008) to acquire Hollister Inn's nonexclusive right-of-way for road purposes did not pass on February 16, 2006.

A new notice informed Hollister Inn that COG's board of directors would reconsider the adoption of a resolution of necessity to acquire a portion of APN 053-380-008 on March 7, 2006. The staff report for that meeting stated in part: "Access from Hollister Inn onto the existing Highway 25 will be closed, and a sign for the Inn and a dumpster on the property will be relocated. The access must be closed due to the curved configuration of the connection of the Bypass to Highway 25. Maintaining the access would result in an unsafe entry point onto the Highway. A design that included this access would not meet Caltrans design standards and would not be consistent with general engineering requirements. [¶] Hollister Inn has an access easement with the Roberts family, owner of the parcel where the easement is located. Hollister Inn would have the opportunity to negotiate an easement with the Roberts family when the existing easement is acquired by COG."

At the March 7, 2006 meeting, Carla Vincent stated: "The existing driveway from the Hollister Inn, crosses a part of another property not owned by the Hollister Inn. . . . The driveway actually goes outside of the easement, but we are acquiring the easement. An offer was made in December of 2005 for acquiring that easement and acquiring the property we need from the adjacent property owner, the Roberts' property in order to build the project. [¶] We had attempted to design a relocated driveway, although it was determined that a second access was not necessary for this property, the Hollister Inn property. We did attempt to relocate the driveway, however it would have had to acquire property and indeed condemn property that didn't belong to the Hollister Inn in order to relocate their driveway further north to a safer location. The project can not [sic] condemn someone else's property for another private entity. . . . [S]o we couldn't do that relocation of the driveway. That's not to say that the private entities themselves, Hollister Inn and Jen Roberts, might not get together and identify another location for that driveway." She explained that leaving the driveway in the current location would not meet Caltrans's (Department of Transportation) safety requirements.

Ann Arnold, speaking on behalf of Hollister Inn, stated that its main objection was that the project was not designed to result in the least private injury. She indicated that the elimination of the inn's main entrance would result in the loss of substantial business from truckers and the owners were going to be in "a very precarious financial position" because they were already required to do about $1 million in upgrades to remain a Best Western franchise. She urged COG to conduct an adequate appraisal statement before passing a resolution of necessity.

COG's board proceeded to pass resolution of necessity 6-13 on March 7, 2006. In the resolution, the board of directors of COG found and determined the requisite facts, including that "[t]he proposed Project is planned or located in the manner that will be most compatible with the greatest public good and the least private injury."

On March 10, 2006, COG filed a complaint in eminent domain against Roberts and respondent Hollister Inn (Super. Ct. San Benito County, No. CU-06-00051). It sought to acquire "partial fee simple interests in property located on San Felipe Road in Hollister, California, Assessor's Parcel No. 053-380-009, together with all improvements situated thereon and together with all rights appurtenant thereto . . . ." The complaint indicated that Roberts was the fee owner and identified respondent Hollister Inn as an "easement holder." It stated that COG had "duly and regularly passed and adopted Resolution No. 06-18 . . . ."

On March 15, 2006, COG filed a complaint against respondent Hollister Inn and the trustee and beneficiary under a deed of trust (Super. Ct. San Benito County, No. CU-06-00054). It sought to acquire Hollister Inn's "access rights at Highway 25 to and from a 30 foot wide appurtenant non-exclusive right of way for road purposes located on Bolsa Road in Hollister California, Assessor's Parcel No. 053-380-008, together with all rights appurtenant thereto . . . ." It recited that COG had "duly and regularly passed and adopted Resolution No. 06-13 . . . ."

Also on March 15, 2006, the court issued orders for immediate possession in both cases.

The two actions were consolidated for all purposes.

A trial on COG's right to take was held.[3] Counsel for Hollister Inn argued in opening that COG committed a gross abuse of discretion in three separate

---

[3] This court granted COG's request to take judicial notice of the reporter's transcript of the trial. (Evid. Code, §§ 452, subd. (d), 459.)

ways: (1) COG failed to adopt or even consider an alternative to taking Hollister Inn's property that would have reduced the private injury without reducing the public good, (2) there was no substantial evidence supporting the taking of Hollister Inn's property, and (3) COG acted based upon an irrevocable commitment to take Hollister Inn's property regardless of the evidence presented. Its counsel asserted that COG's failure to consider the alternative of condemnation pursuant to section 1240.350 to replace Hollister Inn's lost access to Highway 25 was itself an abuse of discretion.

At trial, the parties stipulated that there was an alternative driveway in the project plans from 1996 until a year and a half before the February 2006 hearing. Carla Vincent testified. She indicated that she had no changes to her deposition testimony indicating that a previous plan for the bypass project showed a relocated driveway access to Hollister Inn's property and, although it was possible to design a safe driveway to Hollister Inn, that alternative was not pursued based on the understanding that property cannot be condemned on behalf of another private entity.

Following trial on the right to take, the trial court issued a statement of decision. The trial court found that COG did not have an irrevocable commitment to adopt the resolution. The court found, however, that COG committed a gross abuse of discretion by failing "to consider the possibility of taking the property of an adjoining landowner to provide [respondent Hollister Inn] access to Highway 25" pursuant to section 1240.350. The court further found that COG "failed to exercise its discretion to determine whether the project was planned or located in the manner that will be most compatible with the greatest public good and the least private injury. This is because a safe alternate access was removed from the plans and [COG] was warned by the trusted and competent project manager that the condemnation of the proposed alternate access from [respondent's] property to Highway 25 would violate the law prohibiting the taking of private property from one private party for the benefit of another private party. The Court concludes from these circumstances that the Board did not consider an alternate access to the hotel."

In its decision, the trial court recognized that respondent's property was not landlocked since it had access to San Felipe Road but determined that section 1240.350 did not apply to only landlocked properties. The court concluded that, "as a matter of law," "a plain reading of CCP § 1240.350" permitted condemnation to provide an alternative access to the highway since access to that highway had been cut off.

The court issued an order of conditional dismissal requiring immediate dismissal of the eminent domain action unless COG conducted a noticed public

hearing to reconsider whether respondent Hollister Inn's property was being taken "in a manner that is most compatible with the greatest public good and the least private injury" and, at the hearing, "allow[ed] consideration of alternative access to [respondent's property] from Highway 25" and "exercise[d] its discretion under Code of Civil Procedure Section 1240.350 to determine whether or not it should condemn the requisite portion of the servient estate to provide [respondent Hollister Inn] with alternative access." It provided for Hollister Inn's recovery of "all or part of its costs and reasonable litigation expenses" from COG "in accordance with Code of Civil Procedure Section 1260.120" as subsequently determined in a separate hearing.

By written order dated August 26, 2010, following a hearing on the motion of Hollister Inn to recover reasonable litigation expenses in connection with the court's order of conditional dismissal, the court ordered COG to pay $223,750 to Hollister Inn.

The judgment in condemnation, filed on January 20, 2011, recited that COG had satisfied the requirements of the court's order of conditional dismissal, Hollister Inn had accepted COG's final offer on October 7, 2010, and COG, Roberts, and Hollister Inn had stipulated to the entry of judgment. The judgment established the amount of just compensation to be paid by COG to Roberts and respondent Hollister Inn. It decreed that the use of the property for development and construction of the Highway 25 bypass project was a public use, COG's taking in condemnation was necessary, and the project was "planned and located in the manner that will be most compatible with the greatest public good and the least private injury." As to costs, the judgment stated: "Each party shall bear its own costs and litigation expenses, with the exception of the litigation expenses awarded to Hollister Inn . . . and subject to the understanding that in stipulating to this Judgment Hollister Inn does not waive the filing of a Memorandum of Costs for costs incurred in connection with the Order of Conditional Dismissal . . . . COG plans to object to said Memorandum of Costs on the ground that Hollister Inn waived its entitlement to statutory costs by accepting COG's final offer."

II

*Overview of Law of Eminent Domain*

Under California's statutory eminent domain law, "[t]he power of eminent domain may be exercised to acquire property only for a public use." (§ 1240.010.) This statutory limitation "reiterates the basic constitutional limitation that property may be acquired by eminent domain only for 'public use.' Cal.Const., Art. I, § 19; U.S.Const., Amend. XIV." (Cal. Law Revision Com. com., 1975 Addition, 19 West's Ann. Code Civ. Proc. (2007 ed.) foll. § 1240.010, p. 312.)

Section 1240.010 states in part: "Where the Legislature provides by statute that a use, purpose, object, or function is one for which the power of eminent domain may be exercised, such action is deemed to be a declaration by the Legislature that such use, purpose, object, or function is a public use." But the California Law Revision Commission comment accompanying that section makes clear that "[t]he fact that Section 1240.010 declares that a particular use for which the power of eminent domain may be exercised is a public use does not preclude judicial review to determine whether the proposed use in the particular case is actually a public use. E.g., City & County of San Francisco v. Ross, 44 Cal.2d 52 [279 P.2d 529] (1955)" (Cal. Law Revision Com. com., 1975 Addition, 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1240.010, p. 313.) The comment explains that "[a] legislatively authorized taking will be upheld if the taking is for a 'use which concerns the whole community or promotes the general interest in its relation to any legitimate object of government.' Bauer v. County of Ventura, 45 Cal.2d 276, 284 [289 P.2d 1, 6] (1955)." (*Ibid.*)

California's law of eminent domain establishes three prerequisites to the exercise of the power of eminent domain: "The power of eminent domain may be exercised to acquire property for a proposed project only if all of the following are established: [¶] (a) The public interest and necessity require the project. [¶] (b) The project is planned or located in the manner that will be most compatible with the greatest public good and the least private injury. [¶] (c) The property sought to be acquired is necessary for the project." (§ 1240.030.) "The governing body of the public entity may adopt a resolution of necessity only after the governing body has given each person whose property is to be acquired by eminent domain and whose name and address appears on the last equalized county assessment roll notice and a reasonable opportunity to appear and be heard on the matters referred to in Section 1240.030." (§ 1245.235, subd. (a).)

"A public entity may not commence an eminent domain proceeding until its governing body has adopted a resolution of necessity that meets the [statutory] requirements . . . ." (§ 1245.220.) "Section 1245.230 prescribes the contents of the resolution of necessity by a public entity." (Cal. Law Revision Com. com., 1975 Addition, 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1245.230, p. 421.) A resolution of necessity must contain "[a] declaration that the governing body of the public entity has found and determined each of the following: [¶] (1) The public interest and necessity require the proposed project. [¶] (2) The proposed project is planned or located in the manner that will be most compatible with the greatest public good and the least private injury. [¶] (3) The property described in the resolution is necessary for the proposed project. [¶] (4) That either the offer required by Section 7267.2 of the Government Code has been made to the owner or owners of record, or the offer

has not been made because the owner cannot be located with reasonable diligence." (§ 1245.230, subd. (c).)

"Except as otherwise provided by statute, a resolution of necessity adopted by the governing body of the public entity pursuant to this article *conclusively* establishes the matters referred to in Section 1240.030." (§ 1245.250, subd. (a), italics added.) But "[a] resolution of necessity does not have the effect prescribed in Section 1245.250 to the extent that its adoption or contents were influenced or affected by gross abuse of discretion by the governing body." (§ 1245.255, subd. (b).)

A gross abuse of discretion may be established by showing that adoption of a resolution of necessity by the governing board of a public entity was arbitrary, capricious, or entirely lacking in evidentiary support, the governing body failed to follow the mandated procedure, or the governing body was irrevocably committed to taking the property regardless of the evidence presented at the resolution of necessity hearing. (*Santa Cruz County Redevelopment Agency v. Izant* (1995) 37 Cal.App.4th 141, 149–150 [43 Cal.Rptr.2d 366]; *Redevelopment Agency v. Norm's Slauson* (1985) 173 Cal.App.3d 1121, 1127–1128 [219 Cal.Rptr. 365]; *Huntington Park Redevelopment Agency v. Duncan* (1983) 142 Cal.App.3d 17, 24 [190 Cal.Rptr. 744]; see Legis. Com. com.—Sen., 1978 Amendment, 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1245.255, p. 435.) The adoption of a resolution of necessity that provides a completely vague description of the proposed project constitutes a gross abuse of discretion. (See *City of Stockton v. Marina Towers LLC* (2009) 171 Cal.App.4th 93, 100, 114–115 [88 Cal.Rptr.3d 909].)

It is important to keep in mind that "[t]he adoption of a resolution of necessity is a legislative act and by choosing the more deferential ' "gross abuse of discretion" ' standard, 'the Legislature evidenced an intent to narrowly circumscribe the scope of judicial review' of legislative determinations of necessity. (*Anaheim Redevelopment Agency v. Dusek* [(1987)] 193 Cal.App.3d [249,] 255, 258 [239 Cal.Rptr. 319].)" (*City of Saratoga v. Hinz* (2004) 115 Cal.App.4th 1202, 1221 [9 Cal.Rptr.3d 791].) "The court must not 'retrace the legislative body's analytic route when the statutory scheme requires much greater deference to . . . a condemning body's determination of necessity.' (*Anaheim Redevelopment Agency v. Dusek, supra*, 193 Cal.App.3d at p. 261.)" (*Santa Cruz County Redevelopment Agency v. Izant, supra*, 37 Cal.App.4th at p. 150.)

"A person having an interest in the property described in a resolution of necessity adopted by the governing body of the public entity pursuant to this article may obtain judicial review of the validity of the resolution . . . ."

(§ 1245.255, subd. (a).) Judicial review of the resolution's validity may be obtained "[b]efore the commencement of the eminent domain proceeding, by petition for a writ of mandate pursuant to Section 1085" or "[a]fter the commencement of the eminent domain proceeding, by objection to the right to take pursuant to [the Eminent Domain Law (§ 1230.010 et seq.)]." (§ 1245.255, subd. (a)(1), (2).)

"Section 1250.360 prescribes the grounds for objection to the right to take that may be raised in any eminent domain proceeding regardless of whether the plaintiff has adopted a resolution of necessity that is given conclusive effect on other issues." (Legis. Com. com.—Assem. 1975 Addition, 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1250.360, p. 527.) One of the grounds for objecting to the right to take is that "[t]he stated purpose is not a public use." (§ 1250.360, subd. (b).) In addition to the specified grounds, section 1250.360 includes "[a]ny other ground provided by law." (§ 1250.360, subd. (h).) The legislative committee comment regarding subdivision (h) of section 1250.360 clarifies that "[w]hile the provisions of Section 1250.360 catalog the objections to the right to take available under the Eminent Domain Law where the resolution is conclusive, there may be other grounds for objection not included in the Eminent Domain Law, e.g., where there exist federal or constitutional grounds for objection or where prerequisites to condemnation are located in other codes. [Citations.]" (Legis. Com. com.—Assem., 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1250.360, p. 528.)

"Section 1250.370 lists the grounds for objection to the right to take that may be raised where there is not a conclusive resolution of necessity. [These grounds] may be raised . . . against a public-entity plaintiff in cases where it has not adopted a resolution or where the resolution is not conclusive." (Legis. Com. com.—Sen. 1975 Addition, 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1250.370, p. 530.) They include "[t]he public interest and necessity do not require the proposed project" (§ 1250.370, subd. (b)), "[t]he proposed project is not planned or located in the manner that will be most compatible with the greatest public good and the least private injury" (§ 1250.370, subd. (c)), and "[t]he property described in the complaint is not necessary for the proposed project" (§ 1250.370, subd. (d)).

"Section 1260.110 makes provision for bringing to trial the objections, if any, that have been raised against the plaintiff's right to take. [Citations.]" (Cal. Law Revision Com. com., 1975 Addition, 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1260.110, p. 624.) Under this section, "disposition of the right to take is generally a prerequisite to trial of the issue of just compensation." (Cal. Law Revision Com. com., 1975 Addition, 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1260.110, p. 624.)

"If the court determines that the plaintiff does not have the right to acquire by eminent domain any property described in the complaint," the court must order the immediate or conditional dismissal of the proceeding as to that property. (§ 1260.120, subd. (c).) An order of conditional dismissal provides for the "dismissal of the proceeding as to that property unless such corrective and remedial action as the court may prescribe has been taken within the period prescribed by the court in the order." (§ 1260.120, subd. (c)(2).) An order of conditional dismissal "may impose such limitations and conditions as the court determines to be just under the circumstances of the particular case including the requirement that the plaintiff pay to the defendant all or part of the reasonable litigation expenses necessarily incurred by the defendant because of the plaintiff's failure or omission which constituted the basis of the objection to the right to take." (*Ibid.*; see § 1235.140 [defining "litigation expenses"].)

"Although the trial court normally determines whether the agency has abused its discretion, the appellate court may resolve the issue where the case turns on undisputed facts and involves a pure question of law. [Citations.]" (*City of Stockton v. Marina Towers LLC, supra,* 171 Cal.App.4th at p. 114.)

III

*Discussion*

A. *COG's Contentions on Appeal*

COG asserts that the trial court's order of conditional dismissal, and its concomitant order awarding reasonable litigation expenses, were improper because (1) section 1240.350 applies only to landlocked properties and respondent Hollister Inn's property was not landlocked, (2) COG had no legal obligation to exercise discretion under section 1240.350, (3) respondent Hollister Inn failed to exhaust its administrative remedies by not raising the alternative access issue at the hearings on the resolution of necessity and, therefore, the issue was barred in the trial court, and (4) the court improperly inquired into the motivations of COG's board and failed to properly draw every legitimate inference in favor of COG's decision by concluding, based on the project manager's statements, that COG's board failed to consider an alternative access.

The first two contentions are dispositive of this appeal. Consequently, we find it unnecessary to reach the remaining arguments.

B. *Section 1240.350*

1. *Statutory Construction*

Section 1240.350 was enacted in 1975 as part of the complete overhaul of California's eminent domain law. (Stats. 1975, ch. 1275, § 2, pp. 3409, 3416; see Tentative Recommendation Relating to Condemnation Law and Procedure: The Eminent Domain Law (Jan. 1974) 12 Cal. Law Revision Com. Rep. (1974) pp. 1–496; see also The Eminent Domain Law (Dec. 1975) 13 Cal. Law Revision Com. Rep. (1976) pp. 1002–1262.) Section 1240.350, subdivision (a), provides: "Whenever a public entity acquires property for a public use and exercises or could have exercised the power of eminent domain to acquire such property for such use, the public entity *may* exercise the power of eminent domain to acquire such additional property as appears reasonably necessary and appropriate (after taking into account any hardship to the owner of the additional property) *to provide* utility service to, or *access to a public road* from, any property that is not acquired for such public use but which is *cut off from* utility service or *access to a public road* as a result of the acquisition by the public entity."[4] (Italics added.)

The principles of statutory construction are well established. "Our fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.] We begin by examining the statutory language, giving the words their usual and ordinary meaning. [Citation.] If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.] If, however, the statutory terms are ambiguous, then we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citations.]" (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].)

Respondent Hollister Inn argues that the trial court correctly construed section 1240.350. We are not bound by the trial court's conclusions, since

---

[4] Section 1240.350, subdivision (b), further states: "Where property is sought to be acquired pursuant to this section, the resolution of necessity and the complaint filed pursuant to such resolution shall specifically refer to this section and shall include a statement that the property is necessary for the purpose specified in this section. The determination in the resolution that the taking of the substitute property is necessary has the effect prescribed in Section 1245.250."

interpretation of a statute is a question of law that we review de novo. (See *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332 [104 Cal.Rptr.3d 219, 223 P.3d 77].)

█ " 'Because statutory language "generally provide[s] the most reliable indicator" of that intent [citations], we turn to the words themselves, giving them their "usual and ordinary meanings" and construing them in context [citation].' [Citation.]" (*People v. Robles* (2000) 23 Cal.4th 1106, 1111 [99 Cal.Rptr.2d 120, 5 P.3d 176].) Section 1240.350 provides condemnation authority only when property "is cut off from . . . access to a public road" as a result of acquisition of other property by a public entity. "Cut off" means to "sever" or "separate[ or] isolate." (Webster's 3d New Internat. Dict. (1993) p. 561, capitalization omitted.) "Access" may refer to "a way by which a thing or place may be approached or reached." (Webster's 3d New Internat. Dict., *supra*, p. 11.)

It is possible that section 1240.350's phrase "cut off from . . . access to a public road" means that unacquired property is cut off from access to a particular public road. But the phrase construed in context may also mean that such property has no access whatsoever to a public road; in other words it is landlocked. We observe that section 1240.350 does not authorize the exercise of eminent domain power "to provide access to *the* public road" to which access was lost but rather "to provide . . . access to a public road." (§ 1240.350, subd. (a).)

█ "A statute is regarded as ambiguous if it is capable of two constructions, both of which are reasonable. [Citations.]" (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 776 [72 Cal.Rptr.2d 624, 952 P.2d 641].) "When, as in this case, a statute is ambiguous, we typically consider evidence of the Legislature's intent beyond the words of the statute. The court may examine a variety of extrinsic aids, including the statutory scheme of which the provision is a part, the history and background of the statute, the apparent purpose, and any considerations of constitutionality, 'in an attempt to ascertain the most reasonable interpretation of the measure.' [Citations.]" (*Ibid.*)

In its report proposing the enactment of the new eminent domain law including section 1240.350, the California Law Revision Commission explained the need for such a provision: "In exceedingly rare cases, justice may require that the detriment to the owner of the necessary property be avoided in whole or in part by providing substitute facilities on land of a third party. The most frequently encountered situation of this sort is where the acquisition of the necessary property would leave other property in such condition as to be deprived of utility service or access to a public road. In such a case,

substitute condemnation could provide a quite simple physical solution to what otherwise would be a case of severely damaged property. Accordingly, a public entity should be authorized to condemn such property as appears reasonably necessary and appropriate to supply utility service or access after taking into account any hardship to the owner of the substitute property." (Tentative. Recommendation Relating to Condemnation Law and Procedure: The Eminent Domain Law (Jan. 1974) 12 Cal. Law Revision Com. Rep., *supra*, at pp. 37–38; see The Eminent Domain Law (Dec. 1975) 13 Cal. Law Revision Com. Rep., *supra*, at pp. 1025–1026.)

The legislative committee comment to section 1240.350 states: "Section 1240.350 provides explicit statutory recognition of the right of a public condemnor that acquires property for a public use to condemn such additional property as is *necessary to provide* utility service or *access to property* not taken that would *otherwise lack* utility service or *access* as a result of the acquisition. The utility service or access road need not be open or available to the general public. Under former law, the right to exercise the power of eminent domain for such purposes probably would have been implied from the right to take property for the public improvement itself. Such a taking would be taking for a public use. [Citations.]" (Legis. Com. com.—Assem. 1975 Addition, 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1240.350, p. 369, italics added.)

The legislative committee comment further explains: "Section 1240.350 is intended to resolve several different problems. Frequently, where property is acquired for an engineering-oriented project (such as a freeway or irrigation canal), parcels not acquired will be deprived of utility service or access to a public road. *To restore these parcels to a useful life* and, in doing so, to avoid claims of substantial severance damage, a condemnor is authorized to provide substitute utility service or access in connection with the improvement itself. Although the agreement of the owner of *the landlocked parcel* will generally be obtained, this is not a prerequisite. The owner is not being compensated for property taken; the condemnor is simply minimizing the damage to property retained by the owner. Subdivision (a) of Section 1240.350 requires the condemnor to consider and to minimize the hardship to the owner of both the *land locked* [sic] *parcel* and the substitute property."[5] (Legis. Com.

---

[5] The legislative committee comment to section 1240.350 further states: "Proper consideration as a mitigating factor in determining compensation for the damage, if any, to the property not acquired must be given where the condemnor provides utility service or an access road to property to replace lost utility service or access or commits itself to making such provision. See Section 1263.450 and the Comment to that section." (Legis. Com. com.—Assem. 1975 Addition, 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1240.350, p. 369.) Section 1263.450 provides in part: "Compensation for injury to the remainder shall be based on the project as proposed." "Section 1263.450 makes clear that any 'physical solutions' provided by the

com.—Assem. 1975 Addition, 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1240.350, p. 369, italics added.)

The legislative committee comment's repeated references to "*the* land-locked parcel" (italics added) and to the purpose of restoring a parcel to "a useful life" indicate that section 1240.350 was intended to remedy only the situation where a public entity's acquisition causes or would cause unac-quired property to lose its utility service or public road access. In support of its position that section 1240.350 is not limited to landlocked properties, respondent Hollister Inn cites two of the out-of-state cases mentioned in the comment.[6]

Respondent Hollister Inn argues: "[T]he Legislative Committee Comment invokes the common law, which affirmatively allows condemning agencies to provide substitute access regardless of whether the condemnation results in landlocked property. Under the common law, . . . a condemnor may condemn additional property to create a substitute right-of-way 'for the benefit of parcels of land incidentally deprived of all *or of some means of access* to an existing way.' [Emphasis added.] (*Luke v. Mass. Turnpike Auth.* (1958) 337 Mass. 304, 309 [149, N.E.2d 225]; *May v. Ohio Turnpike Comm'n* (1962) 172 OhioSt. 555, 558 [178 N.E.2d 920] . . . .)"

Section 1230.020, a basic provision of California's eminent domain law, states: "Except as otherwise specifically provided by statute, the power of eminent domain may be exercised only as provided in this title." (See Cal. Law Revision Com. com., 1975 Addition, 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1230.020, p. 229 ["The provisions of the Eminent Domain Law govern all acquisitions by eminent domain except to the extent that specific provision is otherwise made by statute."].) Courts cannot enlarge section 1240.350 based on the "common law."

Assuming the cases mentioned in the legislative committee comment provide some indication of legislative intent in enacting section 1240.350, none of them held that condemnation is permissible for the purpose of providing a substitute private access to a rerouted highway from unacquired property where that property abuts and has access to another public road and

plaintiff to mitigate damages are to be considered in the assessment of damages." (Cal. Law Revision Com. com., 1975 Addition, 19A West's Ann. Code Civ. Proc., *supra*, foll. § 1263.450, p. 109.)

[6] The legislative committee comment to section 1240.350 is clearly derived from the California Law Revision Commission reports regarding eminent domain law. (See Tentative Recommendation Relating to Condemnation Law and Procedure: The Eminent Domain Law (Jan. 1974) 12 Cal. Law Revision Com. Rep., *supra*, at p. 119; see also The Eminent Domain Law (Dec. 1975) 13 Cal. Law Revision Com. Rep., *supra*, at p. 1101.) The identical cases are cited in those reports.

the landowner has another means of reaching that reconfigured highway.[7] Even *Luke v. Massachusetts Turnpike Authority, supra*, 149 N.E.2d 225, the key case cited by respondent, involved a landlocked property.

In *Luke*, the Massachusetts Turnpike Authority (MTA) had acquired property for the purpose of constructing a highway and had taken portions of a public road and of three parcels that abutted that road. After the takings, two of the three parcels "continued to be located on another public way" but the "remaining land (approximately sixteen acres)" of the third parcel owned by defendants Powers was left "without access to any public or private way." (*Luke v. Massachusetts Turnpike Authority, supra*, 149 N.E.2d at p. 226.) The MTA exercised the power of eminent domain for the purpose of "access to and egress from land which otherwise would become isolated due to the no-access provisions of the express toll highway taking" and established a private way easement connecting the three parcels to the road in its new location. (*Id.* at pp. 226, 228.) One of the landowners whose property was taken for the easement objected on the ground the taking for the private easement had no legitimate public purpose, "stress[ing] the language in the order that the 'Powers Private Way' was to provide 'access to and egress from' the Powers property." (*Id.* at pp. 227–228.) The court determined that "[p]rocuring an easement and creating a right of way for the benefit of parcels of land incidentally deprived of all or of some means of access to an existing way are but a byproduct of [the MTA's turnpike] undertaking." (*Id.* at p. 228.) The court stated that the MTA was "not compelled to attempt a new location of the highway" that "would not incidentally result in one or more landlocked parcels" or "to take the entire Powers land so as to avoid the present controversy." (*Ibid.*)

*May v. Ohio Turnpike Com.* (1962) 172 Ohio St. 555 [178 N.E.2d 920], which is also cited by respondent, concerned a single property that became

---

[7] See *North Carolina State Highway Com. v. Asheville School, Inc.* (1970) 276 N.C. 556 [173 S.E.2d 909, 915] [commission's taking of property to provide access to unacquired private land, landlocked by the construction of an interstate highway, was for a public purpose]; *Department of Public Works & Buildings v. Farina* (1963) 29 Ill.2d 474 [194 N.E.2d 209, 213] [department's taking of property to create local service drive to and from a freeway that was being widened and improved conferred a definite benefit to the general public, even if highly beneficial to private interests as well, because the public must be provided with reasonable means to enter and leave the freeway system]; *Tracey v. Preston* (1962) 172 Ohio St. 567 [178 N.E.2d 923] (*per curiam*) [director of highways had authority to acquire land for service road to limited access highway], affirming *Tracey v. Preston* (1960) 114 Ohio App. 206 [181 N.E.2d 479, 482] [unacquired abutting property was landlocked]; *Pitznogle v. Western Maryland Railroad Co.* (1913) 119 Md. 673 [87 A. 917, 919–920] [where railway company's taking for railroad purposes included taking of private road used by persons to reach the "pike north of the railroad from their respective homes," the reviewing court found additional taking to provide a substitute private road to be for a public use where those persons would otherwise be deprived of "the means of reaching the p[ik]e from their homes"].)

landlocked after acquisitions of land for construction of a turnpike. (*Id.*, 178 N.E.2d at p. 922.) In *May*, the turnpike commission was attempting to avoid a contractual obligation to construct a private access road from the plaintiff's landlocked property, across others' private property, to the road. (*Id.* at pp. 921–922.) The commission contended, among other things, that the exercise of eminent domain authority for the purpose of constructing an access road to private property was unconstitutional because the acquisitions were not for a public use. (*Id.* at p. 922.) The court, relying upon the reasoning of *Luke v. Massachusetts Turnpike Authority, supra*, 149 N.E.2d 225, rejected that contention and held that the commission had "the authority, under the Ohio Constitution and the statutes, to acquire, by purchase or by the right of eminent domain, the land or the easements necessary to construct the access road which the defendant agreed to construct . . . ." (*May*, at p. 922.)

■ The more limited interpretation of section 1240.350 is buttressed by well-established rules of statutory construction. It is "a cardinal rule of statutory construction, that 'every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect. [Citations.]' [Citations.]" (*Landrum v. Superior Court* (1981) 30 Cal.3d 1, 14 [177 Cal.Rptr. 325, 634 P.2d 352].) In addition, "[a]n established rule of statutory construction requires us to construe statutes to avoid 'constitutional infirmit[ies].' [Citations.]" (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 846–847 [123 Cal.Rptr.2d 40, 50 P.3d 751].)

■ In accordance with these tenets, we must construe section 1240.350 with reference to the statutory and state and federal constitutional requirements that eminent domain power be used for only a "public use." (U.S. Const., 5th Amend.; Cal. Const., art. I, § 19; Code Civ. Proc., § 1240.010.) The takings clause of the Fifth Amendment to the United States Constitution provides: "[N]or shall private property be taken for public use, without just compensation." It is made applicable to the states by the Fourteenth Amendment. (See *Kelo v. New London* (2005) 545 U.S. 469, 472–473, fn. 1 [162 L.Ed.2d 439, 125 S.Ct. 2655].) Its text "imposes two conditions on the exercise of [taking] authority: the taking must be for a 'public use' and 'just compensation' must be paid to the owner." (*Brown v. Legal Foundation of Wash.* (2003) 538 U.S. 216, 231–232 [155 L.Ed.2d 376, 123 S.Ct. 1406].) The Fifth Amendment's takings clause bars the government from taking "the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation." (*Kelo v. New London, supra*, 545 U.S. at p. 477.)

"[W]hen [the Unites States Supreme] Court began applying the Fifth Amendment to the States at the close of the 19th century, it embraced the

broader and more natural interpretation of public use as 'public purpose.' [Citation.]" (*Kelo v. New London, supra*, 545 U.S. at p. 480.) The United States Supreme Court's "cases have defined that concept broadly, reflecting [its] longstanding policy of deference to legislative judgments in this field." (*Ibid.*) But states are free to place greater restrictions on the government's exercise of the takings power and may impose " 'public use' requirements that are stricter than the federal baseline." (*Id.* at p. 489.)

■ California's Constitution likewise requires the exercise of eminent domain be only for a "public use." (Cal. Const., art. I, § 19, subd. (a), former art. I, § 14.)[8] In *City & County of San Francisco v. Ross* (1955) 44 Cal.2d 52 [279 P.2d 529], the California Supreme Court, applying the former constitutional provision, stated: "The Constitution does not contemplate that the exercise of the power of eminent domain shall secure to private activities the means to carry on a private business whose primary objective and purpose is private gain and not public need." (*Id.* at p. 59 [exercise of the power of eminent domain for the purpose of establishing a parking garage, with retail space on the ground floor, to be leased to and operated by a private party was invalid since "public use" does not include providing "parking at any reasonable rate . . . in metropolitan San Francisco" without regard to the "ownership and primary purpose of operation"].)

As indicated in the legislative committee comment to section 1240.350, the California Supreme Court has stated that "public use" within the meaning of California's Constitution "is defined as a use which concerns the whole community or promotes the general interest in its relation to any legitimate object of government. [Citation.]" (*Bauer v. County of Ventura, supra*, 45 Cal.2d at p. 284.) In *Bauer*, the court also remarked: "To make a use public in character, a duty must fall on the person or corporation holding the property appropriated by eminent domain to furnish the public with the use intended and the public must be entitled to use or enjoy the property taken. [Citations.]" (*Ibid.*) In a case decades later, the California Supreme Court indicated that "public use" is a broad concept and whether a proposed use is a "public use" depends on the facts and circumstances. (See *City of Oakland v. Oakland Raiders* (1982) 32 Cal.3d 60, 69–72 [183 Cal.Rptr. 673, 646 P.2d 835] [acquisition and operation of a football team franchise might serve a valid public purpose].)

■ We think the most reasonable interpretation of section 1240.350 in light of its legislative history and the cardinal rules of statutory interpretation

---

[8] California's Constitution states: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." (Cal. Const., art. I, § 19, subd. (a).) California Constitution, article I, former section 14 contained the same public use limitation: "Private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for, the owner . . . ." (As amended Nov. 5, 1934.)

is that its authority may be invoked to provide access to a public road only where a public entity's acquisition leaves unacquired property without public road access.[9] This interpretation avoids potential constitutional problems involving condemnation for a nonpublic use. It does not preclude the proper exercise of the power of eminent domain for highway purposes, including the provision of local service roads, which is a recognized public use. (See *Rindge Co. v. Los Angeles* (1923) 262 U.S. 700, 706 [67 L.Ed. 1186, 43 S.Ct. 689] ["That a taking of property for a highway is a taking for public use has been universally recognized, from time immemorial."]; *People v. Chevalier* (1959) 52 Cal.2d 299, 304 [340 P.2d 598] ["The taking of property for use as a public street or highway is clearly a taking for an established public use [citations], even though the street or highway will bear relatively little traffic. [Citation.]"]; *Reid v. State of California* (1961) 193 Cal.App.2d 799, 804 [14 Cal.Rptr. 597] ["local service roads are a part of the freeway."].)

Our construction is also consistent with the access theory of condemnation discussed in the respected treatise, Nichols on Eminent Domain. That treatise states: "The access theory permits condemnors to take substitute land to provide access to and from property landlocked as a result of the condemnation. This arises when a landowner has been left with no access to his or her property because the access route has been condemned. [¶] This type of taking is distinguished from a true substitute taking because the motivation behind this taking is premised on purely economic reasons, rather than on the continuance of a public use. The initial condemnee need not be carrying on a public use to receive substitute lands. The public use is served because the primary purpose is to save money. The courts have upheld takings on that ground. Other courts have only allowed such takings when it is both a necessary adjunct to the original taking and also serves as a public use. Still others have held that there is no duty to provide access unless it is in the best interest of the community. This rationale provides a practical answer to the problem of compensating a condemnee who has been left landlocked by condemnation." (2A Nichols on Eminent Domain (3d ed. 2012) § 7.03[9][e], pp. 7-64 to 7-65, fns. omitted.)

We are not presented with the question, and we do not decide, whether condemnation pursuant to section 1240.350 may incidentally benefit other properties if the primary purpose of the additional condemnation is to benefit property that otherwise would lack public road access.

---

[9] The only published case interpreting section 1240.350 involved an eminent domain action to provide access and utility service to the unacquired portion of a property that would become landlocked after the county's acquisition. (*County of Fresno v. Shelton* (1998) 66 Cal.App.4th 996, 1000–1001, 1012 [78 Cal.Rptr.2d 272].) The appellate court held that the county had standing to bring a condemnation action pursuant to section 1240.350 prior to obtaining title to the portion of the property being acquired under a settlement agreement. (66 Cal.App.4th at p. 1012.)

## 2. *COG Did Not Proceed Contrary to Section 1240.350*

Given this court's statutory interpretation of section 1240.350, COG did not proceed contrary to that section by not considering additional condemnation pursuant to that section at the resolution of necessity hearings in February and March 2006. Moreover, even if we assume arguendo that section 1240.350 gives public entities the discretion to exercise eminent domain power to provide a substitute access whenever a public entity's acquisition eliminates the access to a particular public road from unacquired property, the trial court still erred in concluding that COG committed a gross abuse of discretion.

First, we see nothing in section 1240.350, or in any other provision of the eminent domain law, that compels a public entity to consider additional condemnation under section 1240.350 when considering condemnation that will eliminate an unacquired property's access to a particular public road. Nothing in the statutory scheme makes consideration of additional condemnation pursuant to section 1240.350 a prerequisite to the exercise of eminent domain power by a public entity. (Cf., e.g., §§ 1240.030, 1245.220, 1245.230, 1245.235.) Section 1240.350 provides that "the public entity *may* exercise the power of eminent domain . . ." but it does not impose any duty to either exercise such power or to consider exercising such power. For purposes of the Eminent Domain Law, " '[s]hall' is mandatory and 'may' is permissive" (§ 1235.060). The legislative committee comment regarding section 1240.350 makes clear that the authority is permissive and a landowner cannot demand substitute access: "Section 1240.350 provides *discretionary authority* for the condemnor to provide utility service or access. *Where the condemnor does not choose to avail itself of this authority, an owner of property has no right to force such a physical solution* upon it but is limited to the recovery of damages except as provided in Section 1240.410(c)."[10] (Legis. Com. com.— Assem. 1975 Addition, 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1240.350, p. 369, italics added.)

Second, as discussed, the "public use" requirement circumscribes any specific application of section 1240.350, even under the statutory interpretation advocated by respondent. As explained, a valid objection to a condemnor's right to take is that "[t]he stated purpose is not a public use." (§ 1250.360, subd. (b).) In this case, a substitute easement had been considered in the planning of the highway bypass project. Evidently, it had been determined during the precondemnation stage that a substitute access easement from the reconfigured highway to Hollister Inn's property would be for only a private use. We cannot say that conclusion was unreasonable since respondent Hollister Inn's property continues to have access to another public

---

[10] Section 1240.410 empowers a public entity to exercise eminent domain power to acquire remnants of property that would be left after a public entity's acquisition by eminent domain.

road and there was no contention that there is not another means of reaching the highway on public roads from that property, even if it was a less desirable way from respondent's business point of view.

### 3. *Conclusions*

 For all the reasons discussed, the trial court incorrectly determined that COG grossly abused its discretion by failing to consider additional condemnation pursuant to section 1240.350 to provide a substitute access easement to serve Hollister Inn's property before adopting the pertinent resolutions of necessity.[11] Since there was no gross abuse of discretion, those resolutions of necessity must be deemed conclusive as a matter of law as to the matters specified in section 1240.030. (§§ 1245.250, subd. (a), 1245.255, subd. (b); see Legis. Com. com.—Sen. 1975 Addition, 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1245.250, pp. 430–431.) Consequently, Hollister Inn could not contest COG's determination that the project was "planned or located in the manner that will be most compatible with the greatest public good and the least private injury" (§ 1240.030, subd. (b)). In light of the conclusive evidentiary effect mandated by section 1245.250, the trial court erred in issuing an order of conditional dismissal against COG and awarding reasonable litigation expenses to Hollister Inn.

### C. *Attorney Fees on Appeal*

 We also reject respondent Hollister Inn's claim that it is entitled to attorney fees on appeal under section 1260.120, subdivision (c)(2). As discussed, this statutory provision makes plain that a trial court's order of conditional dismissal may include an award of reasonable litigation expenses to a defendant. It says nothing about awarding attorney fees on appeal and, in any event, we have found that the court erred in issuing its orders.

---

[11] The appellate record in this case indicates that Hollister Inn did not object to the right to take by demurrer or answer on the specific ground that COG committed a gross abuse of discretion by failing to follow or exercise discretion under section 1240.350. In an eminent domain action, a defendant may object to the plaintiff's right to take by demurrer or answer. (See § 1250.350.) The demurrer or answer must "state the specific ground upon which the objection is taken and, if the objection is taken by answer, the specific facts upon which the objection is based." (*Ibid.*) Section 1250.345 provides: "Subject to the power of the court to permit an amendment of the answer, if the defendant fails to object to the complaint, either by demurrer or answer, he is deemed to have *waived the objection*." (Italics added.) "Section 1250.345, relating to waiver of objections to the complaint, applies to objections to the right to take." (Cal. Law Revision Com. com., 1975 Addition, 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1250.350, p. 526.) Thus, "an attack on the resolution under Section 1245.255 must be pleaded promptly (Section 1250.345) and must recite the specific facts upon which it is based (Section 1250.350)." (Legis. Com. com.—Sen., 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1245.255, p. 435.) COG has not argued that the gross abuse of discretion theory upon which the trial court relied was "waived" because it was not specifically raised by demurrer or answer.

---

## DISPOSITION

The order of conditional dismissal and the order awarding reasonable litigation expenses are vacated and the judgment is modified to omit those orders. As modified, the judgment is affirmed. Costs on appeal are awarded to the Council of San Benito County Governments.

Rushing, P. J., and Premo, J., concurred.

Respondent's petition for review by the Supreme Court was denied January 3, 2012, S206310.